AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

ORIGINAL

UNITED STATES OF AMERICA
v.

SHANNON BASS

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:13-MJ-175  FILED IN CHAMBERS

FEB 11 2013

U.S. MAGISTRATE JUDGE
N.D. GEORGIA

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning in or about October 2011 and continuing through November 2011, in DeKalb County and elsewhere in the Northern District of Georgia, the defendant did,

conspire to obstruct and affect commerce by unlawfully obtaining United States currency from another person, with the consent of that person, said consent having been induced under color of official right and attempt to possess with intent to distribute cocaine, a Schedule II controlled substance

in violation of Title 18, United States Code, Section 1951 and Title 21, United States Code, Section 841.

I further state that I am a agent of the Federal Bureau of Investigation (FBI) and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof.        (X) Yes ( ) No

Signature of Complainant
James P. Hosty, IV

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it.  Sworn to before me, and subscribed in my presence

February 11, 2013                                              at      Atlanta, Georgia
Date                                                                           City and State


Alan J. Baverman
United States Magistrate Judge                                      Signature of Judicial Officer
Name and Title of Judicial Officer
AUSA Brent A. Gray

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT
## FOR SHANNON BASS

I, James P. Hosty, IV, being duly sworn, depose and state the following:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately 7 years. I am currently assigned to the Atlanta, Georgia office and work on the Civil Rights/Human Trafficking/Public Corruption Squad, which has the responsibility for investigating police corruption, among other federal crimes. I am a law enforcement officer of the United States, FBI, U.S. Department of Justice, within the meaning of Title 18, United States Code, Section 3052, which includes being an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses pursuant to Title 18, United States Code, Section 3052.

2.      During my law enforcement career, I have participated in dozens of investigations relating to drug trafficking and police corruption. I have received specialized training in the methods and techniques used by drug trafficking organizations. I have debriefed many witnesses and confidential informants about drug trafficking generally, as well as the specific practice of employing corrupt law enforcement officers as part of a drug trafficking scheme. Through this training and experience, I have become familiar with many of the patterns of activity exhibited by drug traffickers. Except where I state that I am relying on my training and experience as described here, the information in this affidavit is based on information and belief, the source of that information and basis for that belief being my own investigation and information obtained by other law enforcement agents.

3.      I submit this affidavit in support for a warrant for the arrest of SHANNON BASS for conspiracy to commit extortion under color of official right, in violation of Title 18, United States

Code, Section 1951 and attempted possession with the intent to distribute cocaine in violation of Title 21, United States Code, Section 841.

BACKGROUND OF INVESTIGATION

4.      Based on my training and experience, I know that sophisticated drug trafficking groups distribute narcotics using a variety of covert methods that are designed to avoid detection by law enforcement and others.  If detected, they are aware law enforcement will seize the drugs and money and arrest them.  They also know that other drug dealers or criminal groups will rob them, if given a chance, stealing both the drugs and money. In the worst case, drug deals can turn violent.

5.      Given these risks, drug traffickers occasionally attempt to enlist law enforcement officers to provide protection both for them and the drug transactions they conduct.  In employing corrupt police officers at a drug deal, the traffickers hope to prevent rival groups from intervening and ultimately stealing their drugs and the drug proceeds.  Additionally, they hope to keep legitimate law enforcement at bay by positioning a visible law enforcement presence at or near the drug transactions.  In these cases, drug traffickers are willing to pay thousands of dollars to corrupt law enforcement officers who will provide protection for these transactions.

6.      In August, 2011, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) was investigating a street gang in the Metro Atlanta area.  During the course of that investigation, a confidential informant (CI-1) provided information about the gang's criminal activities.  CI-1 told federal agents that police officers were involved in protecting the gang's activities, including their drug trafficking crimes.  In general, these police officers, in uniform, driving police vehicles or otherwise displaying indicia of their positions, protected the drug dealers from being detected or arrested by other law enforcement officers and from being robbed by other drug dealers.  The

information provided to federal agents by CI-1 regarding the use of law enforcement officers to protect drug deals is consistent with my experience and training in the investigation of similar cases.

7.     CI-1, who had been working with federal agents since August, 2011, communicated to gang members and their associates that CI-1 would need police protection for his/her upcoming drug transactions. Shortly thereafter, Shannon Bass, Jerry B. Mannery, Jr., and Elizabeth Coss, none of whom are law enforcement officers, began identifying to CI-1 law enforcement officers interested in protecting his/her drug deals. Once those individuals were identified, information regarding the location and circumstances of the proposed drug deals was relayed to CI-1 and/or Shannon Bass, Jerry B. Mannery, Jr., Elizabeth Coss for him/her to pass along to law enforcement officers who expressed an interest in protecting the drug transactions.

### FACTS ESTABLISHING PROBABLE CAUSE

8.     On four separate occasions beginning in or around October, 2011 and continuing until in and around November, 2011, SHANNON BASS worked with DeKalb County Police Department (DCPD) Officer Dennis Duren to provide protection for what SHANNON BASS believed to be drug transactions involving multiple kilograms of cocaine.

9.     <u>Meeting on October 3, 2011.</u>  On October 3, 2011, SHANNON BASS, who is not a law enforcement officer, Duren, and CI-1 met at an IHOP restaurant, 5170 Memorial Drive, Stone Mountain, Georgia. During the meeting, CI-1 told SHANNON BASS and Duren that he needed help protecting cocaine and marijuana drug transactions. SHANNON BASS and Duren agreed to assist CI-1 in protecting future drug transactions including one that was planned for October 4, 2011.

10.     <u>Drug Transaction on October 4, 2011.</u>  On October 4, 2011,  FBI and Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agents surveilled a meeting between SHANNON BASS, Duren, a confidential informant (CI-1), and two undercover agents (UC-2 and UC-3) in the

parking lot of a Publix Store, 5158 Memorial Drive, Stone Mountain, Georgia. When CI-1 and UC-2 arrived in the store parking lot, agents observed SHANNON BASS and Duren standing in front of the store entrance. Duren was wearing a DCPD police uniform and a firearm in a holster on his belt. A short time later, UC-3 arrived in the store parking lot. Once UC-3 parked his/her vehicle, CI-1 walked to CI-1's vehicle and retrieved a backpack from the trunk. CI-1 then walked toward UC-3's vehicle with the backpack, and got into UC-3's vehicle. Once inside the vehicle, CI-1 provided UC-3 with a backpack containing three kilograms of counterfeit cocaine. During this transaction, the agents observed Duren patrolling the parking lot and loosely following CI-1. Once CI-1 entered UC-3's vehicle, FBI and ATF agents observed Duren walking around UC-3's vehicle. The agents observed SHANNON BASS standing with UC-2 near the entrance to the store watching UC-3's vehicle. After the drug transaction was completed, CI-1 and UC-2 walked back to CI-1's vehicle and got inside. CI-1 then drove through the shopping center parking lot, and parked near the front entrance of ATL Beauty and Barber. SHANNON BASS then entered CI-1's vehicle, and asked if it was "twenty-two" ($2200). CI-1 then handed a payment of $2,200 SHANNON BASS. SHANNON BASS told CI-1 that he was going to keep $1,500 of the $2,200 for himself, and give the remaining $700 to Duren as payment for his role in protecting the drug transaction. This transaction was audio and video recorded.

11.    Meeting on October 5, 2011.  On October 5, 2011, FBI and ATF agents surveilled a meeting between SHANNON BASS, Duren, CI-1, and UC-2 at an IHOP restaurant, 5170 Memorial Drive, Stone Mountain, Georgia. During this meeting, SHANNON BASS, Duren, CI-1, and UC-2 discussed their participation in the drug transaction which occurred on October 4, 2011, and discussed future drug transactions that SHANNON BASS and Duren would protect for CI-1 and UC-2. Before the meeting began, SHANNON BASS made everyone take their telephones out of

their pockets, remove the batteries, and place them on the table. Bass explained that this had to be done because telephones could be used as listening devices by law enforcement. During the meeting, Duren agreed with CI-1 that the October 4, 2011 drug transaction was not conducted quickly enough to avoid detection. In addition, they all agreed that future drug transactions would occur at one of five different pre-determined locations, which the participants would only refer to by their designated number assigned to each location. This meeting was audio recorded.

12.    <u>Conversation on October 11, 2011.</u>  On October 11, 2011, CI-1 spoke with SHANNON BASS who informed CI-1 that Duren was willing to use a DCPD patrol vehicle to protect drug transactions but that the cost would be $3,000 instead of the originally agreed upon price of $2,200.

13.    <u>Drug Transaction on October 18, 2011.</u>  On October 18, 2011, FBI and ATF agents surveilled a meeting between SHANNON BASS, Duren, CI-1, UC-2 and UC-4 in the parking lot of a Publix Store, 5158 Memorial Drive, Stone Mountain, Georgia. When CI-1 and UC-2 arrived in the store parking lot, the agents observed Duren sitting in his personal vehicle in the parking lot. A short time later, UC-4 arrived and parked his/her vehicle in the parking lot near CI-1's vehicle. CI-1 then got out of his/her vehicle and got into UC-4's vehicle. Once inside the vehicle, CI-1 provided UC-4 with a backpack containing three kilograms of counterfeit cocaine. As soon as CI-1 entered UC-4's vehicle, the agents observed Duren get out of his vehicle and walk up and down the parking stalls near UC-4's vehicle where the drug transaction was taking place. The agents observed Duren wearing his DCPD uniform and a firearm in a holster on his belt. At the same time, SHANNON BASS and UC-2 stood in front of the store and appeared to be watching the drug transaction in UC-4's vehicle. After the drug transaction was completed, SHANNON BASS, Duren, CI-1 and UC-2 met inside the store. During this meeting, UC-2 gave SHANNON BASS the

payment of $2,200 which was to be shared with Duren. This transaction was audio and video recorded.

14.  Drug Transaction on October 24, 2011. On October 24, 2011, FBI and ATF agents surveilled a meeting between SHANNON BASS, Duren, CI-1, UC-2 and UC-4 in the parking lot of a Publix Store, 2162 Henderson Mill Road, Atlanta, Georgia. When CI-1 and UC-2 arrived in the store parking lot, the agents observed Duren walking out of the store toward his personal vehicle in the parking lot. A short time later, UC-4 arrived and parked his/her vehicle in the parking lot near CI-1's vehicle. CI-1 then got out of his/her vehicle and got into UC-4's vehicle. Once inside the vehicle, CI-1 provided UC-4 with a backpack containing three kilograms of counterfeit cocaine. As soon as CI-1 entered UC-4's vehicle, FBI and ATF agents observed Duren get into his personal vehicle and drive to a parking spot directly across from UC-4's vehicle. Duren then got out of his vehicle and walked up and down the parking stalls near UC-4's vehicle where the drug transaction was taking place. FBI and ATF agents observed Duren wearing his DCPD uniform and a firearm in a holster on his belt. At the same time, SHANNON BASS and UC-2 stood in the parking lot and appeared to be watching the drug transaction in UC-4's vehicle. After the drug transaction, SHANNON BASS, CI-1 and UC-2 met at a Red Lobster restaurant, 3937 Lavista Road, Tucker, Georgia. Inside the restaurant, UC-2 gave SHANNON BASS $2,200 which was to be shared with Duren. This transaction was audio and video recorded.

15.  Drug Transaction on November 1, 2011. On November 1, 2011, FBI and ATF agents surveilled a meeting between SHANNON BASS, Duren, CI-1, and CI-2 in the parking lot of a Kroger store, 965 N. Hairston Road, Stone Mountain, Georgia. When CI-1 arrived in the store parking lot, FBI and ATF agents observed Duren, in uniform, driving a DCPD patrol vehicle in the parking lot. The agents also observed SHANNON BASS parked in his personal vehicle in the

parking lot. A short time later, CI-2 arrived and parked his/her vehicle in the parking lot near CI-1's vehicle. CI-1 then got out of his/her vehicle and got into CI-2's vehicle. Once inside the vehicle, CI-1 provided CI-2 with a backpack containing three kilograms of counterfeit cocaine. As soon as CI-1 entered CI-2's vehicle, FBI and ATF agents observed Duren begin to drive his DCPD patrol vehicle in circles around the parking lot. After the drug transaction, CI-1 and SHANNON BASS met at ATL Beauty and Barber Salon, 5254 Memorial Drive, Stone Mountain, Georgia. In the parking lot, CI-1 gave SHANNON BASS $2,200 which was to be shared with Duren. CI-1 explained that he would later pay an additional $800 for the use of the DCPD vehicle. This transaction was audio and video recorded.

16.   Meeting on November 3, 2011.   On November 3, 2011, FBI and ATF agents surveilled a meeting between SHANNON BASS, Duren, CI-1 and UC-2 inside a Red Lobster restaurant, 3937 Lavista Road, Tucker, Georgia. During this meeting, SHANNON BASS and CI-1 left the table and UC-2 and Duren were alone. UC-2 then paid Duren the $800 that was owed from the November 1, 2011 drug transaction. UC-2 and Duren also discussed the amount of cocaine traded during previous transactions. After SHANNON BASS and CI-1 rejoined Duren and UC-2, CI-1 told SHANNON BASS and Duren that there was three kilograms of cocaine in his vehicle trunk. SHANNON BASS and Duren offered to follow CI-1 to a nightclub and provide protection for the cocaine during the trip. This meeting was audio and video recorded.

## CONCLUSION

17.   Based on the foregoing, I submit there is probable cause to believe that SHANNON BASS conspired to commit extortion under color of official right in violation of Title 18, United States Code, Section 1951 and attempted to possess with the intent to distribute cocaine in violation of Title 21, United States Code, Section 841.